UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YVETTE WILLIBY,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>AETNA LIFE INSURANCE COMPANY and DOES 1-10, inclusive,<br><br>　　　　　Defendants. | No. 2:14-cv-04203 CBM (MRWx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL** |

　　　Before the Court is a bench trial based on the administrative record pursuant to the parties' stipulation.  [Dkt. No. 28.]  Having reviewed the administrative record, the parties' trial briefs and arguments of counsel, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.[1]

　　　Plaintiff Yvette Williby ("Williby" or "Plaintiff") brings the present action against Defendant Aetna Life Insurance Company ("Defendant" or "Aetna")

---

[1] [*See* Dkt. Nos. 22, 23, 26, 27.]

1

under the Employee Retirement Income Security Act of 1974 ("ERISA") after Aetna denied her claim for short term disability ("STD") and long term disability ("LTD") benefits under a plan established by her employer, Boeing (the "Plan").

Primarily at issue is Aetna's termination of STD benefits effective February 28, 2013. Plaintiff's claim for STD benefits beyond February 28, 2013 is supported by relevant medical records and opinions of four treating doctors: (1) neurologist Dr. Edelman; (2) neurologist Dr. Ullman; (3) psychiatrist Dr. Lindberg; and (4) neuropsychologist Dr. Budding. Aetna's termination of STD benefits effective February 28, 2013 is based on findings from three reviewing doctors: (1) neurologist Dr. Cohan; (2) occupational medicine specialist Dr. Swotinsky; and (3) neuropsychologist Dr. Mendelssohn.

## I. JURISDICTION

The Court has jurisdiction pursuant to 29 U.S.C. § 1132(e).

## II. FINDINGS OF FACT[2]

1. The Plan is comprised of a Master Welfare Plan and Governing Documents for each benefit program, including the Summary Plan Description ("SPD") for "Disability, Life, and Accident Plans." [A.R. 1-124.]

2. Boeing funds the Short-Term Disability Plan ("STD Plan"), and Aetna administers claims made under the LTD and STD Plans. [A.R. 12-13, 50-51, 114, 123.]

3. Plaintiff began working at Boeing on January 29, 1990. [A.R. at 293, 329, 562.] She was employed as a Supply Chain Specialist with the following job description:

> Defines, plans, develops, coordinates, integrates, and manages support requirements . . . Analyzes and resolves support problems to ensure efficient product operation. Coordinates or

---

[2] Any finding of fact that more appropriately constitutes a conclusion of law, is hereby deemed a conclusion of law, and vice versa. Unless specified otherwise, all citations are to the Administrative Record.

performs multi-discipline support tasks that leads to integrated support program (*e.g.,* system support analysis, technical publications, training, supply support, support services, etc.) Interacts with internal and external customers, vendors and subcontractors. . . [p]erforms research and technical assessments and guides product design. [A.R. 715.]

4. Plaintiff was admitted to the hospital on September 8, 2011, with stroke symptoms. Plaintiff underwent a CAT scan and MRI, which showed findings consistent with a stroke. She was discharged two days later, and at that time, her neurological symptoms had resolved fortunately. [A.R. 853.]

5. Plaintiff saw neurologist Dr. David Edelman on November 14, 2012 for chronic headaches. [A.R. 585]

6. Plaintiff stopped working at Boeing on December 12, 2012. [A.R. at 293, 329, 562.]

7. Plaintiff saw neurologist, Dr. Edelman, on December 12, 2012. Dr. Edelman described Plaintiff's problems as "migraine, acute but ill-defined cerebrovascular disease, and vascular dementia uncomplicated." [A.R. 567-68.] Dr. Edelmen noted for Plaintiff to go on disability "pending further testing." [*Id.* at 568.]

**PLAINTIFF'S CLAIM FOR STD BENEFITS.**

8. Plaintiff submitted a claim for STD benefits in December 2012 that Aetna approved from December 20, 2012 through January 17, 2013. [*Id.*, 561-66.]

9. A "Screening Physician Report" from December 13, 2012, showed results from computerized cognitive testing by Dr. Edelman, which found that Plaintiff's overall cognitive function score was within normal range, but her executive functions predicted a moderate likelihood of "mild cognitive impairment" (greater than 40%). [A.R. 570-571.]

10. An MRI from December 21, 2012, reported "no acute infarct nor hemorrhage and no mass." [A.R. 573-74.]

3

11. Neurologist Dr. Edelman stated on February 19, 2013, in an "Attending Provider's Statement," that Plaintiff needed to be absent from work due to disability from December 13, 2012, through June 1, 2013, based on three diagnoses: (1) mild cognitive impairment; (2) acute cerebrascular disease; and (3) migraine. [A.R. 587-588.]

12. Aetna advised Plaintiff on February 28, 2013, that it received additional medical documentation submitted for continued STD benefits. [A.R. 576-580.] Aetna approved Plaintiff's STD claim through February 28, 2013 based on findings from the MRI and cognitive testing which showed probable impairment of Plaintiff's executive functions (the ability to organize, respond quickly and inhibit incorrect responses). [A.R. 334-35.]

13. Aetna retained neurologist, Dr. Vaughn Cohan, to review Plaintiff's STD claim and determine whether Plaintiff's claim was supported beyond February 28, 2013. [A.R. 583-84.] On March 5, 2013, Dr. Cohan concluded based upon review of Plaintiff's medical records and a telephone consultation with Plaintiff's treating neurologist Dr. Edelman, the documentation failed to support functional impairment from February 28, 2013 through June 1, 2013. [*Id.* at 585-86.] Dr. Cohan acknowledged that the neurological exam by Dr. Edelman found problems with executive functioning, consistent with mild cognitive impairment, but found overall, the exam results were normal and Plaintiff's speech and memory functions were intact. [*Id.* at 585.] Dr. Cohan also explained that during the telephone consultation, Dr. Edelman stated that while formal neuropsychological testing would be required, Plaintiff had not returned for follow up. [*Id.*] Dr. Cohan also noted that the MRI from December 2012 showed white matter ischemic changes and an old small temporoparietal infarct but no acute abnormalities. [*Id.*, 584.]

14. Aetna informed Plaintiff by letter that it terminated her STD benefits

effective February 28, 2013, explaining that its peer review process found that her "condition was not of a severity that would prevent her from working beyond February 28, 2013." [A.R. 606.] Aetna also denied Plaintiff's claim for LTD benefits because she was not eligible for LTD benefits having only received STD benefits from December 20, 2012 to February 28, 2013 (10 weeks—as opposed to the requisite 26-weeks). [*Id.*]

**PLAINTIFF UNDERGOES FURTHER EVALUATION.**

15. Plaintiff was evaluated by neurologist Dr. Edelman on April 30, 2013, and he found evidence that Plaintiff was suffering from cerebral infractions and cognitive problems. Dr. Edelman stated that he did not believe that Plaintiff was able to return to work at that time. [A.R. 833.] He noted that Plaintiff's headaches were not disabling, but her cognitive problems required further workup. [*Id.*]

16. Dr. Edelman examined Plaintiff again on May 28, 2013 and reported that Plaintiff was alert and oriented and her memory appeared intact. [A.R. 835-0836.] He further reported that Plaintiff's cranial nerves were normal, and described her problems as migraine, acute but ill-defined cerebrovascular disease, and vascular dementia uncomplicated. [*Id.*] Dr. Edelman reported similar findings about Plaintiff during three subsequent examinations on July 1, 2013, July 31, 2013, and November 26, 2013. [A.R. 837-38, 893-40, 765-766.]

17. On June 10, 2013, Plaintiff saw another neurologist, Dr. Bernard Ullman, for a consultation. Dr. Ullman reported that Plaintiff's motor function, coordination, and sensory exam appeared "unremarkable." [A.R. 782.]

18. Plaintiff had a follow-up visit with Dr. Ullman on August 12, 2013 during which he referenced findings from a June 5, 2013 neuropsychological evaluation by Dr. Wen, which found that Plaintiff's verbal comprehension index was average, and Plaintiff's IQ, processing speed index and

perceptual reasoning index were low average.[3] [A.R. 779-780.] Dr. Ullman listed the following under "impression" for Plaintiff: (1) Status post right hemisphere stroke; (2) Extensive small vessel ischemic disease of the brain; (3) Depression, as per neuropsychological testing, and (4) Cognitive problems. [Id., 779.] He opined that Plaintiff was disabled:

> The patient scored poorly on many of the psychometric measures. There was some inconsistency, according to Dr. Wen. [] I think, therefore, that it is very important for the patient to have psychiatric evaluation and further treatment. . .[] ***I do believe that she is disabled*** at this time and needs the psychiatric treatment, and then re-testing and a new psychological profile before a judgment can be made on her ability to go back to work. [Id., 780.]

19. On August 15, 2013, neurologist Dr. Edelman certified Plaintiff's disability due to (1) mild cognitive impairment; (2) acute cerebrovascular disease; and (3) migraine. [A.R. 747.]

20. Dr. Edelman saw Plaintiff on August 27, 2013, and reported that Plaintiff's cranial nerves were normal and described her problems as migraine, acute but ill-defined cerebrovascular disease, and vascular dementia uncomplicated. [A.R. 762-63.]

21. On August 27, 2013, Dr. Edelmen requested that Plaintiff's medical leave be extended until further treatment. [A.R. 656.]

22. On September 10, 2013, Dr. Edelman opined that Plaintiff was disabled due to cognitive impairment:

> Williby presented with severe headaches and her initial diagnosis was migraine type headaches. However, MRI scan of the brain showed evidence of stroke, and subsequent testing showed evidence of an autoimmune type disorder. Her initial diagnosis was based upon her clinical presentation and

---

[3] Plaintiff's treating neurologist Dr. Ullman and psychologist Dr. Budding reference findings from a neuropsychological evaluation performed by psychologist Dr. Wen on June 5, 2013. However, Dr. Wen's evaluation is not part of the Administrative Record.

subsequent diagnoses were based on her MRI scan and other testing. She has also been seen by Dr. Wen and by Dr. Ullman. They've also been [sic] confirmed her cognitive impairments. ***Based upon her cognitive impairments alone, she is disabled.*** [A.R. 785 (emphasis added).]

23. As of October 8, 2013, psychiatrist Dr. Carol Lindberg was treating Plaintiff for depression and anxiety secondary to her medical conditions, including the stroke from September 2011.[4] [A.R. 784.]

24. Plaintiff saw neurologist Dr. Ullman on November 1, 2013, who listed under "impression" cognitive problems following Plaintiff's stroke. [A.R. 1201.]

25. On August 30, 2013, in an "Attending Provider's Statement," neurologist Dr. Edelman listed Plaintiff's date of disability as December 12, 2012 and anticipated that Plaintiff could return to work on September 27, 2013. [A.R. 822.]

26. Plaintiff consulted with neuropsychologist Deborah Budding on September 13, 2013.[5] [A.R. 1214.]

27. Dr. Budding opined on December 10, 2013, that Plaintiff appeared to be demonstrating "***considerable cognitive impairment***" and recommended she undergo thorough neuropsychological evaluation. [A.R. 1214 (emphasis added).]

28. Psychiatrist Dr. Lindberg opined on December 12, 2013, that Plaintiff was disabled:

> "I do not believe that grief and depression account for the full extent of her impairment and I have referred her for a comprehensive neuro-psychological testing to define the complete extent of her cognitive deficits. ***Because of her***

---

[4] Medical records from psychiatrist Dr. Lindberg are not part of the Administrative Record, however, she opines on Plaintiff's cognitive impairment and disability by letter. [A.R. 1222.]

[5] Medical records from neuropsychologist Deborah Budding are not part of the Administrative Record, however, she opines on Plaintiff's cognitive impairment by letter. [A.R. 2114.]

*significant cognitive slowing and impairment in concentration, memory, and word-finding, it is my professional opinion that she is disabled from any gainful occupation for which she is reasonably suited*." [A.R. 1222 (emphasis added).]

29. Neurologist Dr. Ullman completed an "Attending Physician Statement" on December 19, 2013, in which he stated that Plaintiff was disabled due to stroke, migraine, and cognitive impairment. [A.R. 1230.]

**PLAINTIFF'S APPEAL.**

30. Plaintiff appealed Aetna's termination of benefits by letter on December 11, 2013. [A.R. 685-688.] Along with the appeal letter, Plaintiff's counsel enclosed a completed Appeal Request Form and submitted additional medical records. [*See* A.R. 685-1214.] While Plaintiff maintains that she appealed Aetna's denial of benefits by a letter dated September 6, 2013, nothing in the record indicates that the letter was sent to Aetna in September. [A.R. 793.] Plaintiff's appeal was due in September 2013, but Aetna accepted the late appeal in December 2013. [*See* A.R. 352, 354.]

31. Aetna retained Dr. Robert Swotinsky (specialist in occupational medicine) who completed a peer review of Plaintiff's claim on February 14, 2014, based on review of Plaintiff's medical records and a teleconference with her treating neurologist, Dr. Edelman. [*See* A.R. 1247-1260.] Dr. Swotinsky found a lack of significant objective clinical documentation to support functional impairment that would preclude Plaintiff from performing her occupation from March 1, 2013 through June 12, 2013. Dr. Swotinsky found Plaintiff's impairment was "self-reported and [] primarily based on mood disorder/behavioral issues. . ." [*Id*., 1258.] Dr. Swotinsky had a telephone consultation with Plaintiff's treating neurologist, Dr. Edelman, on February 11, 2014. [*Id*., 1255.] Dr. Edelman stated that he believed Plaintiff's cognitive impairment was subjective, and he had discussed Plaintiff's neurological testing with Dr. Wen, which showed results

8

consistent with depression. [*Id*. at 1253.]

32. Aetna retained neuropsychologist, Elana Mendelssohn, who also completed a peer review of Plaintiff's claim on February 11, 2014, based on review of Plaintiff's medical records and teleconferences with Plaintiff's treating physicians Dr. Edelman and Dr. Lindberg. [*See* A.R. 1261-69.] Dr. Mendelssohn concluded that "the provided information did not include sufficient findings to corroborate the presence of impairment in neuropsychological functioning interfering with Plaintiff's ability to perform her job duties from March 1, 2013 to June 12, 2013." [*Id*., 1268.] Dr. Mendelssohn found that the documentation "did not indicate observations or findings of neuropsychological impairment. . . [r]ather, it was consistently indicated that [Plaintiff] presented as cognitively intact." [*Id*. at 1267-68.] She also explained that while records referenced reports of anxiety and depression, there were no findings showing impairment in emotional or behavioral functioning. [*Id*. at 1267.]

33. On February 18, 2014, Aetna upheld its decision to terminate STD benefits as of February 28, 2013, based on its determination that "there was insufficient medical evidence to support continued disability" beyond February 28, 2013. [A.R. 1270-72.] Aetna also upheld its denial of Plaintiff's claim for LTD benefits because she had not met the 26-week waiting period. [*Id*.]

### III. CONCLUSIONS OF LAW

**AETNA'S APPEAL DECISION WAS TIMELY.**

1. Plaintiff argues that Aetna did not make an appeal decision within 45 days as required by 29 C.F.R. § 2560.503-1(i)(2)(iii). As set forth *supra*, Plaintiff appealed Aetna's denial of benefits on December 11, 2013. [AR 1223.] Aetna reviewed Plaintiff's appeal and timely issued a decision on February 18, 2014, less than a month after Plaintiff's counsel advised Aetna

1              that he had submitted all documentation for Aetna's appeal review. [A.R.
2              1231, 1242-43, 1270-72.]

### *DE NOVO* STANDARD OF REVIEW.

4    2.   A denial of benefits under 29 U.S.C. §1132(a)(1)(B) is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 956-957 (1989). Where the plan or policy grants such discretion, the standard of review is abuse of discretion. *Id.* at 957; *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc). However, provisions that reserve discretionary authority to insurers to determine eligibility for benefits in contracts or policies in effect after January 1, 2012, are void and unenforceable under California Insurance Code § 10110.6.[6]

3.   The parties do not dispute that the Plan and SPD unambiguously confer discretionary authority to Aetna to administer claims and make decisions regarding benefits.[7] [*See* A.R. 12-13, 51.] Defendant argues that the

---

[6] Cal. Ins. Code § 10110(a) provides in relevant part: "[i]f a policy, contract, [] or agreement. . . that provides or funds [] disability insurance coverage. . .contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, [] or agreement. . .that provision is void and unenforceable."

[7] The Plan provides in relevant part: "The Plan Administrator's powers include full discretionary authority to interpret the Plan, including the power to construe ambiguities, remedy inconsistencies and repair scrivener's errors. The Plan Administrator has full discretionary authority to determine all questions that may arise including all questions relating to the eligibility. . . to participate in the Plan and the amount of benefits to which any Participant or Dependent may become entitled, and any benefits under this Plan will be payable to a Participant or Dependent only if the Plan Administrator determines in its discretion that the Participant of Dependent is entitled to them. . . ." [*See* A.R. 12.] The SPD provides in relevant part: "The Plan Administrator has the exclusive right, power and authority, in its sole and absolute discretion, to administer, apply, construe, and interpret the Plan and related Plan documents. Decide all matters and questions arising in connection with entitlement to benefits and the nature, type, form, amount, and duration of benefits. . ." [A.R. 112.] The Plan and SPD also provide for delegation of such discretionary authority to Aetna to make benefit determinations. [*See* A.R. 13, 112.]

insurance code does not apply because (1) the STD benefits are self-funded by Boeing,[8] and (2) Aetna is granted discretion by the Plan, which is not an insurance policy, and thus, not regulated by the insurance code. Several district courts have found, although not in the context of self-funded plans, that Section 10110.6 applies to ERISA plan documents because the statute expressly applies to contracts *and* insurance policies.[9] A federal court interpreting a state statute gives the language of the statute its "usual, ordinary import," but if the statute's wording is ambiguous, it may consider extrinsic evidence of legislative intent. *In re First T.D. & Inv., Inc.,* 253 F.3d 520, 527 (9th Cir. 2001). Section 10110.6 by its plain language applies to any insurance policy, contract, certificate or agreement, and "an ERISA plan is a contract." *Harlick v. Blue Shield of Cal.,* 686 F.3d 699, 708 (9th Cir. 2012). The statute's legislative history reinforces its application to employer-sponsored ERISA plans. A report from a June 22, 2011, hearing refers to an opinion letter from the Insurance Commissioner's counsel that explained: "in group, employer-sponsored disability contracts that are governed by ERISA, the presence of a discretionary clause has the legal effect of limiting judicial review of a denial of benefits to a review for abuse of discretion. . . .[t]his standard of review deprives California insureds of the benefits for which they bargained, access to the protections of the Insurance Code[,] and other protections in California law." *See* June 22, 2011, Senate Bill No. 621. The Court finds that the provisions

---

[8] [A.R. 114, 123.]

[9] *See, e.g., Jahn-Derian v. Metro. Life Ins. Co.,* No. 13-7221, 2015 WL 900717, at *3 (C.D. Cal. Mar. 3, 2015); *Gonda v. The Permanente Med. Grp., Inc.,* 10 F. Supp. 3d 1091, 1095 (N.D. Cal. 2014); *Snyder v. Unum Life Ins. Co. of Am.,* No. 13-07522, 2014 WL 7734715, at *8 (C.D. Cal. Oct. 28, 2014); *Curran v. United of Omaha Life Ins. Co.*, 38 F.Supp.3d 1184, 1191 (S.D. Cal 2014); *Polnicky v. Liberty Life Assur. Co. of Boston, et al.*, 999 F.Supp.2d 1144, 1147 (N.D. Cal. 2013); *Hodjati v. Aetna Life Ins. Co.,* No. 13-05021, 2014 WL 7466977, at *12 (C.D. Cal. Dec. 29, 2014).

conferring discretionary authority to Aetna are void and unenforceable pursuant to Cal. Ins. Code § 10110.6. Because the Court finds the provisions conferring discretionary authority to Aetna are void and unenforceable, the Court reviews whether Aetna correctly or incorrectly denied benefits *de novo*. *See Firestone*, 489 U.S. at 957; *see also Abatie*, 458 F.3d at 963.

### AETNA PREMATURELY TERMINATED PLAINTIFF'S STD BENEFITS.

4. The parties agree that Plaintiff bears the burden of showing by a preponderance of the evidence that she was entitled to benefits under the terms of the STD Plan. *See, e.g., Muniz v. Amec Const. Mgmt., Inc.,* 623 F.3d 1290, 1294 (9th Cir. 2010). To establish that Plaintiff is entitled to STD benefits, she must demonstrate that her condition prevented her from performing the material duties of her occupation as a Supply Chain Specialist beyond February 28, 2013, the effective date that Aetna terminated Plaintiff's STD benefits.[10]

5. Plaintiff's treating neurologist, Dr. Edelman, saw Plaintiff at least five times from February 2013 through December 2013, when Plaintiff appealed Aetna's termination of benefits. [*See* A.R. 833, 835-88, 893-40, 762-63.] Dr. Edelman opined that Plaintiff's cognitive impairment, acute cerebrovascular disease, and migraines rendered her disabled. [A.R. 747, 785.] Dr. Edelman's opinion that Plaintiff was disabled beyond February 2013 was consistent with his prior findings—and Aetna's determination— that Plaintiff was disabled from December 12, 2012 to February 28, 2013.

---

[10] The STD plan defines "disability" as follows:
You become disabled as a result of accidental injury[or] illness [] and your accidental injury [or] illness [] prevents you from performing the material duties of your own occupation or other appropriate work the Company makes available.
- You continue under the care of a physician throughout your disability. You also may be required to be examined by a physician chosen by the service representative as often as reasonably necessary to verify your disability.
- You are earning 80 percent or less of your indexed predisability earnings. [A.R. 119].

[*Id*. at 570.] Nothing in the record suggests that Plaintiff's cognitive impairment ceased or improved such that Plaintiff could resume performing the material duties of her occupation after February 28, 2013. Rather, Plaintiff underwent additional evaluation by a second neurologist, a physiatrist, and a psychologist. Dr. Ullman, Dr. Lindberg, and Dr. Budding all opined—consistent with Dr. Edelmen—that Plaintiff was disabled or suffered from considerable cognitive impairment. Neurologist, Dr. Ullman, opined that Plaintiff was temporarily disabled as of August 12, 2013. [A.R. 780-83.] Dr. Lindberg opined that Plaintiff was still disabled from any suitable gainful occupation as of December 2013 because of cognitive slowing and impairment in concentration, memory, and word-finding. [A.R. 1222.] Psychologist Dr. Budding similarly found that as of December 2013, Plaintiff was demonstrating "considerable cognitive impairment." [A.R. 1214.] Aetna's reviewing doctors summarized the findings and opinions of Plaintiff's treating physicians and found a lack of significant objective clinical documentation supporting a finding of functional impairment from February 28, 2013 to June 1, 2013. The Court in weighing the evidence and respective opinions, gives more weight to those doctors who treated Plaintiff.[11] *See, e.g., Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 676 (9th Cir. 2011). Based on medical records and opinions of Plaintiff's treating doctors, the Court finds that Plaintiff has established by a preponderance of the evidence that she was disabled within the STD Plan's definition of disability beyond February 28, 2013 through the STD Plan's 26-week period (December 20, 2012 to June 20, 2013).[12] Aetna thus prematurely terminated Plaintiff's STD benefits.

---

[11] The Administrative Record did not contain a curriculum vitae for any of Plaintiff's treating doctors or any of Aetna's reviewing doctors.

[12] Even under an abuse of discretion standard, the Court finds that in viewing Aetna's decision with no degree of skepticism since Aetna did not have a conflict of interest, *i.e.*, it did not have a direct

13

## IV. **CONCLUSION**

The Court therefore finds based upon medical records and opinions of Plaintiff's treating doctors, that Defendant improperly denied Plaintiff's claim for STD and LTD on February 28, 2013. Plaintiff was entitled to receive STD benefits for an additional 16 weeks in accordance with the terms of the STD Plan.[13]

**IT IS SO ORDERED.**

DATED: August 31, 2015

---

Honorable Consuelo B. Marshall
United States District Judge

---

financial incentive to deny benefits since benefits are funded by Boeing, Aetna nonetheless abused its discretion in terminating Plaintiff's STD benefits. Aetna's decision was illogical, implausible, or without support in inferences that could reasonably be drawn from facts in the record because (1) all of the doctors who personally treated Plaintiff concluded that she was disabled or demonstrating considerable cognitive impairment; and (2) Aetna's reviewing doctors cited to lack of objective clinical support, but there is no evidence that Aetna requested for Plaintiff to be examined by its physicians or undergo the specific testing it needed to support an objective, clinical finding of functional impairment. *See, e.g., Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666-76 (9th Cir. 2011).

[13] Because Plaintiff's claim for LTD benefits was denied on the ground that Plaintiff was not eligible for LTD benefits having received STD benefits for only 10 weeks—as opposed to the required 26 weeks—the Court makes no findings regarding Plaintiff's eligibility or entitlement to LTD benefits pursuant to the LTD Plan. [A.R. 561, 605.]