# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YVETTE WILLIBY,<br><br>　　Plaintiff,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>　　Defendant. | Case No. 14-cv-04203 CBM (MRWx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL ON REMAND** |

Before the Court is a trial based on the administrative record after remand. Having reviewed the administrative record, arguments of counsel, and the mandate from the Ninth Circuit, the Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.[1]

Plaintiff Yvette Williby ("Williby" or "Plaintiff") presents this action against Defendant Aetna Life Insurance Company ("Defendant" or "Aetna") under the Employee Retirement Income Security Act of 1974 ("ERISA") after Aetna denied her claim for short term disability ("STD") and long term disability ("LTD") benefits under a plan established by her employer, Boeing (the "Plan").

Primarily at issue is Aetna's termination of STD benefits effective February 28, 2013. Plaintiff's claim for STD benefits beyond February 28, 2013 is supported by relevant medical records and opinions of four treating doctors: (1) neurologist Dr. Edelman; (2) neurologist Dr. Ullman; (3) psychiatrist Dr. Lindberg; and (4)

---

[1] [*See* Dkt. Nos. 22, 23, 26, 27.]

1

neuropsychologist Dr. Budding. Aetna's termination of STD benefits effective February 28, 2013 is based on findings from three reviewing doctors: (1) neurologist Dr. Cohan; (2) occupational medicine specialist Dr. Swotinsky; and (3) neuropsychologist Dr. Mendelssohn.

## I. JURISDICTION

The Court has jurisdiction pursuant to 29 U.S.C. § 1132(e).

## II. FINDINGS OF FACT

1. The Plan is comprised of a Master Welfare Plan and Governing Documents for each benefit program, including the Summary Plan Description ("SPD") for "Disability, Life, and Accident Plans." [A.R. 1-124.]
2. Boeing funds the Short-Term Disability Plan ("STD Plan"), and Aetna administers claims made under the LTD and STD Plans. [A.R. 12-13, 50-51, 114, 123.]
3. Plaintiff began working at Boeing on January 29, 1990. [A.R. at 293, 329, 562.] She was employed as a Supply Chain Specialist with the following job description:
   > Defines, plans, develops, coordinates, integrates, and manages support requirements . . . Analyzes and resolves support problems to ensure efficient product operation. Coordinates or performs multi-discipline support tasks that leads to integrated support program (*e.g.*, system support analysis, technical publications, training, supply support, support services, etc.) Interacts with internal and external customers, vendors and subcontractors. . . [p]erforms research and technical assessments and guides product design. [A.R. 715.]
4. Plaintiff was admitted to the hospital on September 8, 2011, with stroke symptoms. Plaintiff underwent a CAT scan and MRI, which showed findings consistent with a stroke. She was discharged two days later, and at that time, her neurological symptoms had resolved fortunately. [A.R. 853.]
5. Plaintiff saw neurologist Dr. David Edelman on November 14, 2012 for chronic headaches. [A.R. 585]

6. Plaintiff saw neurologist, Dr. Edelman, on December 12, 2012. Dr. Edelman described Plaintiff's problems as "migraine, acute but ill-defined cerebrovascular disease, and vascular dementia uncomplicated." [A.R. 567-68.] Dr. Edelmen noted for Plaintiff to go on disability "pending further testing." [*Id.* at 568.]

7. Plaintiff stopped working at Boeing on December 12, 2012. [A.R. at 293, 329, 562.]

**Plaintiff's Claim for STD Benefits.**

8. Plaintiff submitted a claim for STD benefits in December 2012 that Aetna approved from December 20, 2012 through January 17, 2013. [*Id.*, 561-66.]

9. A "Screening Physician Report" from December 13, 2012, showed results from computerized cognitive testing by Dr. Edelman, which found that Plaintiff's overall cognitive function score was within normal range, but her executive functions predicted a moderate likelihood of "mild cognitive impairment" (greater than 40%). [A.R. 570-571.]

10. An MRI from December 21, 2012, reported "no acute infarct nor hemorrhage and no mass." [A.R. 573-74.]

11. Based on the documentation submitted and Aetna's medical guidelines, Aetna approved Williby's claim for STD benefits from December 13, 2012 through February 28, 2013. (AR 561-566, 575-580.) ***Aetna explained that if Williby was unable to work after February 28, 2013, she would need to submit an Attending Physician Statement ("APS") providing "a clear understanding of how your disability continues to affect your work capacity."*** (AR 576.) Aetna further explained that "benefits will not be considered beyond 02/28/13 until we receive and review additional medical information provided by your physician." (AR 576.)

## Aetna Obtained A Peer Review By A Board-Certified Physician

12. Aetna determined that the medical documentation appeared to support Williby's reported cognitive difficulties through February 28, 2013, but the claim would need to be submitted for a peer review to determine whether any benefits were supported beyond that date. (AR 334.)

13. To aid in its evaluation of whether Williby was capable of performing her occupation beyond February 28, 2013, Aetna requested a peer review from a specialist in Neurology. Vaughn Cohan, M.D., who is Board Certified in Neurology, completed the requested peer review on March 5, 2013. (AR 581-586.) In formulating his analysis, Dr. Cohan reviewed Williby's medical records and conducted a peer-to-peer conference with Plaintiff's treating neurologist, Dr. Edelman. (AR 585.)

14. During the peer-to-peer consultation with Dr. Cohan, Dr. Edelman expressed doubt that Williby could perform her occupation, but he could not opine as to whether she was impaired due to an organic/cognitive impairment or a behavioral health/psychiatric impairment. He recommended formal neuropsychological testing. However, Williby had not returned for follow-up, was not currently scheduled for follow-up, and was not believed to be compliant for purposes of conducting a formal neuropsychological evaluation in any case. (AR 585.)

15. Based on his review of the available medical records and consultation with Dr. Edelman, **Dr. Cohan concluded that the documentation failed to support functional impairment from a neurologic perspective from February 28, 2013 through June 1, 2013.** (AR 585-86.) He explained that "there is no evidence that the claimant's headaches are of such frequency, severity, intensity, and/or duration, as to preclude work," and that Dr. Edelman "does not consider her to be disabled from work based on her headaches." (AR 585.) He further explained that Williby's

*"neurologic examination findings as reported by Dr. Edelman on 12/12/12 were within normal limits, including speech and memory functioning."* (AR 585, emphasis added.) Although a brief computerized evaluation of cognitive functioning concluded that she had some problems with executive functioning, her "speech and memory functions were said to be intact," and Dr. Edelman could not opine as to whether Williby's "perceived problems with cognitive functioning represent an organic versus a psychological disorder." (AR 585.)

### Aetna Determined That Williby No Longer Met the Definition of Disability As Set Forth In Her Plan

16. On March 12, 2013, Aetna notified Williby of its decision to terminate her claim for STD benefits. (AR 605-606.) Aetna reiterated the plan's definition of total disability and explained that it evaluated Williby's subjective and objective medical information. (AR 605.) Aetna informed Williby that, in order to determine if functional impairment was supported beyond February 28, 2013, her claim was reviewed by a physician specializing in Neurology, who reviewed her file and conducted a peer-to-peer consultation with Dr. Edelman. Aetna detailed Dr. Cohan's findings and explained that there was a lack of medical evidence to support a continued functional deficit that would prevent Williby from performing her own sedentary job duties beyond February 28, 2013. (AR 606.)

17. Aetna informed Williby of her right to request a review of this decision and invited her to provide additional medical information to support her claim, including: (1) A detailed description of her functional impairments and restrictions, with evidence to support those limitations; (2) A detailed explanation of how the severity of her condition is documented, other than by subjective complaints; (3) Any documents or information specific to the condition(s) for which she is claiming total disability, and which would

assist in the evaluation of her disability status; and (4) Any other information or documentation she believes may assist Aetna in reviewing her claim, such as formal neuropsychological testing. (AR 606.)

18. The next day, Aetna received an APS completed by Dr. Edelman on February 19, 2013, opining that Williby had no ability to work due to symptoms of headaches and forgetfulness. However, he provided no supporting cognitive testing results or exam findings. (AR 587-589.)

**Williby Appealed Aetna's Decision**

19. On December 11, 2013, Williby's counsel appealed Aetna's decision to terminate Plaintiff's STD benefits and deny LTD benefits. (AR 685-688.) Although Williby's appeal was late, Aetna accepted it. (AR 352-54.)

20. Williby's appeal letter enclosed additional medical records, including a November 14, 2012 office note from Dr. Edelman stating that Williby's memory appears to be intact, cranial nerves and muscle strength were normal, deep tendon reflexes were symmetric, sensory exam was intact to touch, pin, vibration and position, cerebellar modalities "are done well", and gait and station were smooth and aligned. (AR 828-829.) An office note from August 27, 2013 indicated Williby's chief complaint as forgetfulness. Her exam was normal and her problems are noted as migraine, acute but ill-defined cerebrovascular disease, and vascular dementia uncomplicated. (AR 762-763.) An office note from November 26, 2013 again noted her exam was normal. (AR 765-766.)

21. The appeal also included a record from Richard S. Gluckman, M.D., Neurology, who examined Williby on July 18, 2012 for migraines. The neurologic exam noted normal cognitive functioning. (AR 1099-1102.)

22. A June 10, 2013 neurology consultation with Bernard Ullman, M.D., notes that Williby's "Motor function, sensory exam, and coordination were unremarkable. (AR 781-783.) Williby had a follow-up visit with Dr.

Ullman on August 12, 2013 during which he noted that neuropsychological testing was done by Dr. Johnny Wen, Ph.D., with a report of June 5, 2013: "I have reviewed the extensive report with the patient. Her Full Scale IQ was low average. Verbal Comprehension Index was average. Processing Speed Index was low average. Perceptual Reasoning Index was low average. Dr. Wen felt that one component of her poor performance was due to depression, and Dr. Edelman put her on Lexapro but this has not made her feel better, nor has the Ativan." Dr. Ullman noted he thought it was very important for Williby to have a psychiatric evaluation and further treatment and to have her taper off over the next six weeks from the Ativan, if possible, as this may introduce difficulty with regard to her cognitive functioning. (AR 779-780.)

23. In a letter dated December 10, 2013, Deborah Budding, Ph.D., Neuropsychology, states that Plaintiff was referred to her for a neuropsychological second opinion by Drs. Lindberg and Ullman. Plaintiff underwent neuropsychological evaluation by Johnny Wen, Ph.D. in May and June of 2013. Dr. Budding concluded: "I am of the opinion that Ms. Williby appears to be demonstrating considerably [sic] cognitive impairment at this time, ***and should undergo a thorough neuropsychological evaluation.***" (AR 1214, emphasis added.)

24. In a letter dated December 12, 2013, Carol Lindberg, M.D., Psychiatrist, states that she referred Williby for comprehensive neuro-psychological testing, but does not indicate that the testing was ever performed. (AR 1222.)

25. Neurologist Dr. Edelman stated on February 19, 2013, in an "Attending Provider's Statement," that Plaintiff needed to be absent from work due to disability from December 13, 2012, through June 1, 2013, based on three

diagnoses: (1) mild cognitive impairment; (2) acute cerebrascular disease; and (3) migraine. [A.R. 587-588.]

26. Aetna advised Plaintiff on February 28, 2013, that it received additional medical documentation submitted for continued STD benefits. [A.R. 576-580.] Aetna approved Plaintiff's STD claim through February 28, 2013 based on findings from the MRI and cognitive testing which showed probable impairment of Plaintiff's executive functions (the ability to organize, respond quickly and inhibit incorrect responses). [A.R. 334-35.]

27. Aetna informed Plaintiff by letter that it terminated her STD benefits effective February 28, 2013, explaining that its peer review process found that her "condition was not of a severity that would prevent her from working beyond February 28, 2013." [A.R. 606.] Aetna also denied Plaintiff's claim for LTD benefits because she was not eligible for LTD benefits having only received STD benefits from December 20, 2012 to February 28, 2013 (10 weeks—as opposed to the requisite 26-weeks). [*Id.*]

**Plaintiff Undergoes Further Evaluation.**

28. Plaintiff was evaluated by neurologist Dr. Edelman on April 30, 2013, and he found evidence that Plaintiff was suffering from cerebral infractions and cognitive problems. Dr. Edelman stated that he did not believe that Plaintiff was able to return to work at that time. [A.R. 833.] He noted that Plaintiff's headaches were not disabling, but her cognitive problems required further workup. [*Id.*]

29. Dr. Edelman examined Plaintiff again on May 28, 2013 and reported that Plaintiff was alert and oriented and her memory appeared intact. [A.R. 835-0836.] He further reported that Plaintiff's cranial nerves were normal, and described her problems as migraine, acute but ill-defined cerebrovascular disease, and vascular dementia uncomplicated. [*Id.*] Dr. Edelman reported similar findings about Plaintiff during three subsequent

examinations on July 1, 2013, July 31, 2013, and November 26, 2013. [A.R. 837-38, 893-40, 765-766.]

30. On June 10, 2013, Plaintiff saw another neurologist, Dr. Bernard Ullman, for a consultation. Dr. Ullman reported that Plaintiff's motor function, coordination, and sensory exam appeared "unremarkable." [A.R. 782.]

31. Plaintiff had a follow-up visit with Dr. Ullman on August 12, 2013 during which he referenced findings from a June 5, 2013 neuropsychological evaluation by Dr. Wen, which found that Plaintiff's verbal comprehension index was average, and Plaintiff's IQ, processing speed index and perceptual reasoning index were low average.[2] [A.R. 779-780.] Dr. Ullman listed the following under "impression" for Plaintiff: (1) Status post right hemisphere stroke; (2) Extensive small vessel ischemic disease of the brain; (3) Depression, as per neuropsychological testing, and (4) Cognitive problems. [*Id.*, 779.] He opined that Plaintiff was disabled:
> The patient scored poorly on many of the psychometric measures. There was some inconsistency, according to Dr. Wen. [] I think, therefore, that it is very important for the patient to have psychiatric evaluation and further treatment. . .[] ***I do believe that she is disabled*** at this time and needs the psychiatric treatment, and then re-testing and a new psychological profile before a judgment can be made on her ability to go back to work. [*Id.*, 780.]

32. On August 15, 2013, neurologist Dr. Edelman certified Plaintiff's disability due to (1) mild cognitive impairment; (2) acute cerebrovascular disease; and (3) migraine. [A.R. 747.]

33. Dr. Edelman saw Plaintiff on August 27, 2013, and reported that Plaintiff's cranial nerves were normal and described her problems as migraine, acute

---

[2] Plaintiff's treating neurologist Dr. Ullman and psychologist Dr. Budding reference findings from a neuropsychological evaluation performed by psychologist Dr. Wen on June 5, 2013. However, Dr. Wen's evaluation is not part of the Administrative Record.

but ill-defined cerebrovascular disease, and vascular dementia uncomplicated. [A.R. 762-63.]

34. On August 27, 2013, Dr. Edelmen requested that Plaintiff's medical leave be extended until further treatment. [A.R. 656.]

35. Aetna requested an additional peer evaluation from a specialist in Occupational Medicine, which Robert Swotinsky, M.D., an independent physician who is Board Certified in Occupational Medicine, completed on February 14, 2014. (AR 1247-1259.) In formulating his analysis, Dr. Swotinsky reviewed Williby's medical records and conducted a peer-to-peer conference with Williby's treating neurologist, Dr. Edelman. (AR 1255-56.) **When asked to identify the findings that have established she cannot work because of cognitive impairment, Dr. Edelman responded that the only problems are "subjective," meaning "self-reported."** (AR 1255.) Dr. Edelman stated that Williby has decreased memory and that while nothing shows up on gross exam, it did show up on the neuropsychological test. However, he acknowledged he had not seen the neuropsychological test report. (AR 1255.) Dr. Edelman spoke with Dr. Wen, who stated that Williby's test results were consistent with depression. (AR 1255-56.)

36. On August 30, 2013, in an "Attending Provider's Statement," neurologist Dr. Edelman listed Plaintiff's date of disability as December 12, 2012 and anticipated that Plaintiff could return to work on September 27, 2013. [A.R. 822.]

37. On September 10, 2013, Dr. Edelman opined that Plaintiff was disabled due to cognitive impairment:
> Williby presented with severe headaches and her initial diagnosis was migraine type headaches. However, MRI scan of the brain showed evidence of stroke, and subsequent testing showed evidence of an autoimmune type disorder. Her initial

10

diagnosis was based upon her clinical presentation and subsequent diagnoses were based on her MRI scan and other testing. She has also been seen by Dr. Wen and by Dr. Ullman. They've also been [sic] confirmed her cognitive impairments. ***Based upon her cognitive impairments alone, she is disabled.*** [A.R. 785 (emphasis added).]

38. Plaintiff consulted with neuropsychologist Deborah Budding on September 13, 2013.[3] [A.R. 1214.]

39. As of October 8, 2013, psychiatrist Dr. Carol Lindberg was treating Plaintiff for depression and anxiety secondary to her medical conditions, including the stroke from September 2011.[4] [A.R. 784.]

40. Plaintiff saw neurologist Dr. Ullman on November 1, 2013, who listed under "impression" cognitive problems following Plaintiff's stroke. [A.R. 1201.]

41. Dr. Budding opined on December 10, 2013, that Plaintiff appeared to be demonstrating ***"considerable cognitive impairment"*** and recommended she undergo thorough neuropsychological evaluation. [A.R. 1214 (emphasis added).]

42. Psychiatrist Dr. Lindberg opined on December 12, 2013, that Plaintiff was disabled:
> "I do not believe that grief and depression account for the full extent of her impairment and I have referred her for a comprehensive neuro-psychological testing to define the complete extent of her cognitive deficits. ***Because of her significant cognitive slowing and impairment in concentration, memory, and word-finding, it is my professional opinion that she is disabled from any gainful occupation for which she is reasonably suited.***" [A.R. 1222 (emphasis added).]

---

[3] Medical records from neuropsychologist Deborah Budding are not part of the Administrative Record, however, she opines on Plaintiff's cognitive impairment by letter. [A.R. 2114.]

[4] Medical records from psychiatrist Dr. Lindberg are not part of the Administrative Record, however, she opines on Plaintiff's cognitive impairment and disability by letter. [A.R. 1222.]

11

43. Neurologist Dr. Ullman completed an "Attending Physician Statement" on December 19, 2013, in which he stated that Plaintiff was disabled due to stroke, migraine, and cognitive impairment. [A.R. 1230.]

**Plaintiff's Appeal.**

44. Plaintiff appealed Aetna's termination of benefits. [A.R. 685-688.]

**Aetna Obtained A Peer Review By A Board-Certified Specialist In Neuropsychology**

45. Aetna requested an additional peer evaluation from a specialist in Neuropsychology. Elana Mendelssohn, Psy.D., an independent physician who specializes in Neuropsychology, completed the requested peer review on February 11, 2014. (AR 1261-1268.) In formulating her analysis, Dr. Mendelssohn reviewed Williby's medical records and conducted peer-to-peer conferences with Dr. Edelman and Dr. Lindberg. (AR 1267.) During their conversation, *Dr. Edelman indicated that he did not perform any in-depth testing, and that Williby appeared alert and oriented. He also indicated that he did not observe any obvious cognitive difficulties.* (AR 1267.)

46. Based on her review of the available medical records and her teleconferences with Dr. Edelman and Dr. Lindberg, *Dr. Mendelssohn concluded that there were "insufficient findings to corroborate the presence of impairment in neuropsychological functioning interfering with the claimant's ability to perform her job duties from 3/1/13 through 6/12/13."* (AR 1268.) Dr. Mendelssohn explained that although "it was reported that the claimant suffered a stroke in 2011 . . . it is noteworthy that documentation from 2011 and 2012 primarily reflected normal neuropsychological status." Dr. Mendelssohn further explained:
> In relation to the specific timeframe under consideration, there was no indication the claimant was under the care of a mental health specialist and examination findings were not provided to

reflect the presence of impairment in emotional or behavioral functioning due to reports of anxiety and depression. Similarly, ***despite subsequent reports of cognitive difficulties, documentation from the claimant's treating providers, in relation to the timeframe under consideration, did not indicate observation or findings of neuropsychological impairment. Rather it was consistently indicated that the claimant presented as cognitively intact.***
(AR 1267-68, emphasis added.)

47. Dr. Mendelsson found that, "[a]lthough more recent information has included the opinion that the claimant evidences significant cognitive difficulties, this would be inconsistent with the review of documentation in relation to the timeframe under consideration and going back to 2011." (AR 1268.)

48. Aetna further informed Williby that, to afford her every opportunity available, her file was reviewed by two independent physicians, one specializing in Occupational Medicine and one specializing in Neuropsychology, who each found insufficient medical evidence of functional impairment to substantiate continued disability. (AR 1271.)

49. Aetna advised Williby that the records did not support any stroke-related impairment precluding work. To the contrary, the records contained normal diagnostic findings, and no neurological abnormalities. There was reference to white matter lesions on the brain on magnetic resonance imaging (MRI) but this is a nonspecific finding, ubiquitous in the normal as well as the demented population. Accordingly, no diagnostic impressions were made from this finding, nor was any treatment recommended. (AR 1271.)

50. Aetna further explained that, while it was reported Williby suffered a stroke in 2011, the "documentation from 2011 and 2012 primarily reflected normal neuropsychological status." (AR 1271.) The normal course of recovery from stroke is one of improvement, not deterioration, and Williby

returned to work through December 2012, thus demonstrating capacity to work despite whatever residual impairment may have occurred from the stroke. (AR 1271.)

**Aetna Obtained an Additional Peer Review By A Board-Certified Physician Specializing In Occupational Medicine**

51. Aetna requested an additional peer evaluation from a specialist in Occupational Medicine, which Robert Swotinsky, M.D., an independent physician who is Board Certified in Occupational Medicine, completed on February 14, 2014. (AR 1247-1259.) In formulating his analysis, Dr. Swotinsky reviewed Williby's medical records and conducted a peer-to-peer conference with Williby's treating neurologist, Dr. Edelman. (AR 1255-56.) *When asked to identify the findings that have established she cannot work because of cognitive impairment, Dr. Edelman responded that the only problems are "subjective," meaning "self-reported."* (AR 1255.) Dr. Edelman stated that Williby has decreased memory and that while nothing shows up on gross exam, it did show up on the neuropsychological test. However, he acknowledged he had not seen the neuropsychological test report. (AR 1255.) Dr. Edelman spoke with Dr. Wen, who stated that Williby's test results were consistent with depression. (AR 1255-56.)

52. On February 18, 2014, Aetna upheld its decision to terminate STD benefits as of February 28, 2013, based on its determination that "there was insufficient medical evidence to support continued disability" beyond February 28, 2013. [A.R. 1270-72.] Aetna also upheld its denial of Plaintiff's claim for LTD benefits because she had not met the 26-week waiting period. [*Id.*]

## III. CONCLUSIONS OF LAW

### The Abuse of Discretion Standard Governs Judicial Review of Aetna's Denial of STD Benefits

53. Because it contains a discretionary clause, the STD plan by its terms calls for abuse of discretion review.

54. The treating physician rule does not apply, as the Supreme Court has held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

55. Aetna appropriately based its opinion on its own independent review. *See Ibrahim v. Bayer Corp. Disability Plan*, 2012 U.S. Dist. LEXIS 119220 *36-37 (C.D. Cal. 2012) (administrator did not abuse its discretion by relying on the opinion of an independent physician's review instead of the claimant's physicians); *Safavi v. SBC Disability Income Plan*, 493 F. Supp. 2d 1107, 1119 (C.D. Cal. 2007) (administrator did not abuse its discretion by relying on opinion of reviewing physician that the claimant was not disabled as opposed to the treating physician's certification of disability).

///
///
///
///
///
///
///
///

## IV. CONCLUSION

Aetna conducted a full and fair review of Williby's claim and appeal and appropriately determined that Williby failed to meet her burden. Aetna's decision to terminate STD benefits was reasonable and supported by the administrative record

Any finding of fact that more appropriately constitutes a conclusion of law, is hereby deemed a conclusion of law, and vice versa. Unless specified otherwise, all citations are to the Administrative Record.

**IT IS SO ORDERED.**

DATED: November 26, 2018

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE